[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10257

_____

D.C. Docket Nos. 1:09-md-02036-JLK; 1:10-cv-22190-JLK


MICHAEL DASHER,

Plaintiff - Appellee,

versus

RBC BANK (USA),
d.b.a. RBC Bank,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 10, 2014)

Before CARNES, Chief Judge, WILSON, Circuit Judge, and DALTON,[*] District
Judge.

---

[*] Honorable Roy B. Dalton, Jr., United States District Judge for the Middle District of
Florida, sitting by designation.

WILSON, Circuit Judge:

This dispute arose when Michael Dasher and other checking account customers sued RBC Bank for allegedly charging excessive overdraft fees in breach of their account agreement.[1]  The *Dasher* action is part of the larger Checking Account Overdraft Multidistrict Litigation (MDL) pending in district court.[2]  At issue here is the district court's denial of RBC's renewed motion to compel arbitration.  The district court denied the motion, despite the fact that an earlier version of the parties' agreement contained an arbitration clause, because that agreement was entirely superseded by a newer agreement that is silent on arbitration.  When, under state law, parties agree to supersede an old contract by forming a new one, basic contract principles require us to look only to the new agreement for evidence of the parties' intent.  Looking to the new agreement here, the parties' silence provides no evidence that they agreed to be bound to arbitrate their disputes.  Accordingly, we affirm.

I.

---

[1] Plaintiffs allege, among other things, that RBC reordered debit card purchases at the end of each day to draw funds for larger purchases before smaller ones rather than drawing funds chronologically.  The effect was to artificially deplete accounts in fewer transactions, leaving more numerous but smaller purchases to be drawn from a depleted account, each of which led to a $35 overdraft fee.

[2] This MDL, collectively referred to as MDL 2036, has been consolidated in the Southern District of Florida.  Two relevant actions are pending against RBC: *Dasher v. RBC Bank (USA)*, Case No. 1:10-cv-22190-JLK, filed in the Southern District of Florida, and *Avery v. RBC Bank*, Case No. 5:10-cv-329, filed in the Eastern District of North Carolina.  The *Avery* action is encompassed in the *Dasher* action, and this opinion will refer to all relevant plaintiffs as Dasher.

RBC previously appealed the district court's denial of its motion to compel arbitration.  At that time, the relationship between the parties was governed by an account agreement issued in 2008 by RBC and subsequently accepted by Dasher (RBC Agreement).  The RBC Agreement contained an arbitration clause with terms broad enough to cover this overdraft fee dispute, but the district court found the provision unenforceable because it "ha[d] the effect of deterring Plaintiff from bringing his claim and vindicating his rights." *In re Checking Account Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 3361127, at *2 (S.D. Fla. Aug. 23, 2010).  Before we heard RBC's appeal, the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S. Ct. 1740 (2011).  *Concepcion* potentially altered the legal basis for the district court's opinion, and the parties accordingly moved to vacate and remand for reconsideration.

On remand, and while the RBC Agreement still governed the parties' relationship, RBC filed a renewed motion to compel arbitration.  Dasher requested an opportunity to conduct discovery, and the request was granted.  In 2012, while discovery was ongoing and before the district court ruled on RBC's renewed motion, PNC Financial Services Group, Inc. (PNC) acquired RBC, giving PNC possession of Dasher's account.  In advance of its acquisition, PNC issued an account agreement to govern the relationship with Dasher (PNC Agreement),

3

which Dasher accepted.  Unlike the RBC Agreement, the PNC Agreement did not contain an arbitration clause—in fact, it did not mention arbitration at all.

Subsequently, at oral argument before the district court on RBC's renewed motion to compel arbitration, the parties disputed whether the RBC Agreement or the PNC Agreement controlled.  RBC argued that the RBC Agreement controlled and that the arbitration provision in that agreement was enforceable in light of *Concepcion*.  Dasher argued that the PNC Agreement entirely superseded the RBC Agreement, and therefore the district court should look only to the PNC Agreement to determine whether the parties agreed to arbitrate.  Given the absence of an agreement to arbitrate in the PNC Agreement, this would require the court to deny RBC's motion without reaching the question of enforceability.  The district court agreed with Dasher, concluding that the 2012 PNC Agreement entirely superseded the 2008 RBC Agreement.  Finding no evidence that the parties agreed to arbitrate their disputes in the PNC Agreement, the district court denied RBC's motion.  RBC timely appealed.[3]

## II.

On appeal, RBC argues that the district court made five reversible errors: (1) the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, creates a presumption in

---

[3] The district court denied RBC's instant motion to compel arbitration without reaching the issue of enforceability.  Dasher claims that even if we disagree with the district court about which agreement controls, the arbitration clause remains unenforceable despite *Concepcion*, so we should affirm.  Because we agree with the district court that the RBC Agreement has been superseded, we too do not reach the question of enforceability.

favor of arbitrability that the district court failed to apply; (2) contrary to the district court's holding, the PNC Agreement's silence on arbitration cannot invalidate the RBC Agreement's arbitration provision; (3) the district court improperly ignored the termination clause in the RBC Agreement; (4) the district court improperly applied the PNC Agreement retroactively to disputes that arose while the RBC Agreement was still in effect; and (5) the district court relied upon provisions in the RBC Agreement to support its analysis, undermining its holding that the RBC Agreement was entirely superseded and proving that the arbitration clause was "singled out" for disfavored treatment in violation of the FAA.

"We review the denial of [a] motion to compel arbitration de novo." *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1257 (11th Cir. 2003). Applying this standard, we review each of RBC's claims in turn.

## A.

RBC argues that arbitration was required in this case because the FAA creates "a presumption of arbitrability in the sense that an order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (1986) (internal quotation marks omitted). Stated differently, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope

5

of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S. Ct. 927, 941 (1983); *see also Kidd v. Equitable Life Assurance Soc'y of U.S.*, 32 F.3d 516, 519 (11th Cir. 1994) (same). Further, the presumption applies when an "arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, __, 130 S. Ct. 2847, 2858 (2010). RBC contends that arbitrability is in doubt, that there is a reasonable interpretation of the agreements that would require arbitration, and that the district court therefore erred under the FAA by refusing to resolve doubts and interpret the agreements in favor of arbitration.

Had the district court based its opinion on a narrow interpretation of the RBC Agreement's arbitration clause, or had it resolved some ambiguity in that clause against arbitration, RBC's claim might have merit. Given the breadth of the RBC Agreement's arbitration provision, however, there is no ambiguity "about whether it covers the dispute at hand." *Id.* at __, 130 S. Ct. at 2858. If the arbitration provision is valid, it covers this dispute. Here, however, the parties do not dispute the "scope of arbitrable issues," *Cone*, 460 U.S. at 24, 103 S. Ct. at

941, because neither the scope nor the interpretation of the RBC Agreement's arbitration clause is at issue.[4]

Instead, RBC and Dasher disagree about whether the RBC Agreement has been superseded such that it does not apply to any disputes, regardless of the breadth of its scope or how it is interpreted. The FAA's presumption is inapplicable in this situation, as courts are to apply "the presumption of arbitrability *only* where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Granite Rock*, 561 U.S. at __, 130 S. Ct. at 2858 (emphasis added). *Granite Rock* thus precludes application of the FAA's presumption of arbitrability before it is determined whether there is a "validly formed and enforceable arbitration agreement." *Id.* As the Second Circuit recognized, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011). This is essentially a dispute about whether a "validly formed . . . agreement" has been

---

[4] There is a possibility, discussed *infra* in note 10, that the arbitration clause might not cover disputes arising from acts that occurred before the RBC Agreement became effective in 2008, even if the clause remains effective. We do not decide that issue, but it is worth mentioning as an example of when the FAA's presumption might apply. If the RBC Agreement is valid, the question of whether it covers disputes arising from acts that occurred before 2008 would turn on the clause's scope, meaning the FAA's presumption should apply. Here, we address the very different threshold question of whether the RBC Agreement is valid, so the presumption does not apply.

made.  *Granite Rock*, 561 U.S. at \_\_, 130 S. Ct. at 2858; *see also Applied Energetics*, 645 F.3d at 526 (explaining that the FAA's presumption does not apply in cases where the agreement containing an arbitration clause has been superseded).  Therefore, the district court properly refused to apply the FAA's presumption in favor of arbitrability.

B.

Even without applying the FAA's presumption, RBC contends that the parties have a validly formed, enforceable arbitration agreement.  In assessing the validity of this claim, we must be mindful of the Supreme Court's instruction that "arbitration is simply a matter of contract."  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1924 (1995).  Accordingly, when determining whether an arbitration agreement exists, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *Id.* at 944, 115 S. Ct. at 1924; *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) ("[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts.").  These principles dictate that courts look for evidence that the parties "objectively revealed an intent to submit the [dispute] to arbitration."  *First Options*, 514 U.S. at 944, 115 S. Ct. at 1924.  Thus, to resolve

this case we apply North Carolina contract law and look for objective evidence that the parties agreed to arbitrate.

This matter is complicated by the fact that the parties dispute which agreement controls, with Dasher arguing that the PNC Agreement replaced the RBC Agreement and RBC contending that the RBC Agreement remains effective. This, too, is resolved by applying state contract law without the FAA's presumption of arbitrability. *See Applied Energetics*, 645 F.3d at 526.[5] Under North Carolina law, "[w]hether a new contract between the same parties discharges or supersedes a prior agreement between them depends upon their intention[s] as ascertained from the instrument[s]." *Penney v. Carpenter*, 231 S.E.2d 171, 173 (N.C. Ct. App. 1977) (internal quotation marks omitted).

*Burgess v. Jim Walter Homes, Inc.* is instructive on both state law questions—whether the parties formed an agreement to arbitrate and whether that agreement has been superseded. 588 S.E.2d 575 (N.C. Ct. App. 2003). In *Burgess*, the parties executed a contract for the construction of a house and a

---

[5] In *Caley*, we explained that "[t]he 'federal policy favoring arbitration . . . is taken into consideration even in applying ordinary state law.'" 428 F.3d at 1368 (quoting *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004)). The federal policy favoring arbitration is not, however, the same as applying a presumption of arbitrability. We only apply the presumption of arbitrability to the interpretation of contracts if we have already determined that, under state law, the parties formed a valid agreement to arbitrate. *See Granite Rock*, 561 U.S. at __, 130 S. Ct. at 2857–58 ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* . . . its enforceability or applicability to the dispute is in issue. . . . . That . . . some of our cases applying a presumption of arbitrability to certain disputes do not discuss each of these requirements merely reflects the fact that in those cases some of the requirements were so obviously satisfied that no discussion was needed.").

separate arbitration agreement which was incorporated by reference into the underlying contract. *Id.* at 576. No work was performed pursuant to the contract, but several years later, the parties executed an entirely new contract for the same construction project with different costs and specifications. *Id.* Again, the new contract referenced a separate arbitration agreement, but no separate arbitration agreement was ever prepared or signed. *Id.* at 576–77. Because the new contract did not contain its own arbitration agreement, the contract was held insufficient to show "an agreement to arbitrate disputes between the parties." *Id.* at 578 (internal quotation marks omitted). When a dispute arose, and one party sought to compel arbitration based on the original agreement, the court held:

> [Because] the parties expressed their clear and definite intent to execute a new contract to supersede the [prior] contract . . . the [new] contract supersedes the [prior] contract. The [new] contract did not incorporate by reference the prior . . . arbitration agreement. Without the execution of a new . . . Arbitration Agreement, [defendants] cannot prove the existence of an agreement to arbitrate all disputes arising out of the [new] contract.

*Id.* (citation and internal quotation marks omitted). *Burgess* clearly establishes that the RBC Agreement is superseded if "the parties expressed their clear and definite intent to execute [the PNC Agreement] to supersede the [RBC Agreement]," and if they did, "the [PNC] contract supersedes the [RBC] contract." *Id.* (internal quotation marks omitted).

10

Here, the parties expressed their "clear and definite intent" that the PNC Agreement would supersede the RBC Agreement. The RBC Agreement's assignment clause states:

> We may transfer or assign our rights and obligations under the Agreement in whole or in part without notice to or approval by you . . . . [T]he terms and conditions of the Agreement will be binding upon and inure to your benefit and our benefit as well as the benefit of your permitted successors and assigns and *our successors and assigns*.

(Emphasis added.) When PNC acquired RBC, it is undisputed that PNC became a "successor[] and assign[ee]," essentially stepping into RBC's shoes and inheriting all of RBC's rights under the RBC Agreement. *See* 12 U.S.C. § 215a(e).

One of the rights PNC acquired from RBC under the RBC Agreement was the right to change "any part or parts of the Agreement" at any time pursuant to the RBC Agreement's amendment clause. Further, if RBC—or its successor PNC— exercised this right and issued a new agreement, the amendment clause stipulated that "the most current version of the Agreement *supersedes all prior versions* and will at all times govern." (Emphasis added.)

PNC exercised its assigned right to change "any part or parts of the [RBC] Agreement" by issuing the entirely new PNC Agreement. According to terms drafted by RBC in the RBC Agreement, by issuing a new agreement, the parties "supersede[d] all prior versions" of the account agreement. Thus, PNC "expressed [its] clear and definite intent to execute a new contract to supersede" the RBC

11

Agreement. *Burgess*, 588 S.E.2d at 578 (internal quotation marks omitted).

Further, even though RBC did not itself issue the new agreement, PNC had stepped

into RBC's shoes. *See* 12 U.S.C. § 215a(e). Thus, RBC, which was then a part of

PNC, was bound by whatever decision PNC made with regard to superseding the

RBC Agreement.[6] Finally, Dasher expressed his clear and definite intent to

execute a new agreement by accepting first the RBC Agreement and then the

superseding PNC Agreement. Because all parties expressed the clear and definite

intent that the PNC Agreement supersede the RBC Agreement, the district court

properly concluded that, under North Carolina law, the RBC Agreement was

entirely superseded by the PNC Agreement.

Having determined that the PNC Agreement superseded the RBC

Agreement, "we must consider whether the [PNC Agreement] alone is sufficient to

bind the parties to arbitration." *Burgess*, 588 S.E.2d at 577. Our analysis turns on

whether there is sufficient evidence to show "an agreement to arbitrate disputes

between the parties." *Id.* at 578 (internal quotation marks omitted). Quite clearly,

---

[6] RBC disputes this conclusion in part because only the now-superseded RBC Agreement, not the PNC Agreement, states that the most current version of the agreement supersedes prior versions. They claim that if the RBC Agreement is superseded, it is paradoxical to rely on the RBC Agreement to determine that the RBC Agreement is superseded. This argument is not well-taken, as RBC's argument would entirely preclude parties from contracting for the termination of a contract. If, for example, parties set a termination date after which the contractual terms were no longer effective, RBC would have us believe that we could not refer to the now-terminated contract to determine the date of its termination. Similarly, the RBC Agreement stipulated the manner and effect of superseding the agreement. There is nothing paradoxical about enforcing those terms, which are, by definition, only applicable after the agreement is superseded. To hold otherwise would be to render those terms meaningless.

there is not.  Indeed, the PNC Agreement is entirely silent on arbitration, providing even less evidence of an agreement to arbitrate than was present in *Burgess*, where the parties at least mentioned arbitration.  *Id.* (finding insufficient evidence of an agreement to arbitrate and noting that while the subsequent agreement mentioned an arbitration addendum, that addendum was never attached or signed); *see also Emmanuel Afr. Methodist Episcopal Church v. Reynolds Constr. Co.*, 718 S.E.2d 201, 203 (N.C. Ct. App. 2011) (stating that, in order to form an arbitration agreement, the parties must "specify . . . the scope and terms of their agreement"); *D.P. Solutions, Inc. v. Xplore-Tech Servs. Private Ltd.*, 710 S.E.2d 297, 300 (N.C. Ct. App. 2011) ("Arbitration is simply a matter of contract . . . . [T]o determine whether the parties agreed to submit a particular dispute or claim to arbitration, we must look at the language in the agreement." (internal citation and quotation marks omitted)).  It appears, then, that the district court properly denied RBC's motion. *See Granite Rock*, 561 U.S. at __, 130 S. Ct. at 2856 ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." (emphasis omitted)); *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1214 (11th Cir. 2011) ("[P]arties will not be required to arbitrate when they have not agreed to do so." (internal quotation marks omitted)).

RBC resists this straightforward application of the terms of the parties' agreements, which would ordinarily end the inquiry, by arguing that even if the

RBC Agreement is superseded, its arbitration clause is not.  This is so, RBC contends, because arbitration clauses can only be waived by clear and explicit language and therefore cannot be waived by silence.  *See WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997) ("The [subsequent agreement] does not mention the [prior] Agreement—much less its arbitration clause—and the [subsequent agreement's] provisions . . . do not constitute the kind of clear and specific waiver required to defeat the express arbitration provision in the [prior] Agreement."); *see also Cone*, 460 U.S. at 24–25, 103 S. Ct. at 941 (applying the FAA's presumption to resolve "doubts concerning the scope of arbitrable issues" when "the problem at hand is . . . an allegation of waiver").

The obvious response is that this case does not involve *waiver* of an arbitration provision at all; rather, it involves superseding the entire agreement containing an arbitration provision and replacing that provision with silence. These are two very different situations: waiver situations involve a still-valid underlying prior agreement, while the situation here involves an entirely invalid underlying prior agreement.  In the waiver context, the agreements may create ambiguity with regard to arbitration, but here, it is clear that all provisions in the prior agreement are eliminated under state law, including the arbitration provision, and nothing in the new agreement establishes the right to compel arbitration anew.

14

At this point, RBC reaches its last line of defense.  RBC claims that even when parties supersede—rather than waive—a prior agreement containing an arbitration clause by forming a new agreement that is silent on arbitration, the prior agreement's arbitration clause remains binding.  In these situations, RBC contends that the arbitration clause can only be superseded if it is *specifically* eliminated by the superseding agreement.  In other words, RBC claims that silence in a subsequent agreement is per se insufficient to eliminate an earlier agreement's arbitration provision.  This leads to the implausible conclusion that when parties indicate a clear intent to supersede a prior agreement, that superseding language applies to every term in the prior agreement except for arbitration provisions.

RBC claims to find support for its proposition in cases decided by our sister circuits.  In *Bank Julius Baer & Co. v. Waxfield Ltd.*, the parties signed an agreement requiring arbitration then entered into a new agreement that superseded all prior agreements and contained a merger clause stating that the new agreement constituted the entire agreement between the parties.  424 F.3d 278, 282 (2d Cir. 2005).  Notwithstanding claims that the arbitration clause was superseded, the Second Circuit held that "the Arbitration Clause . . . remain[s] in effect" because the subsequent agreement "does not even mention arbitration."  *Id.* at 284, 285.  The same sequence of events occurred in *Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.*, and the Third Circuit compelled arbitration in part

15

because "any reference to arbitration" was "[c]onspicuously absent from the" subsequent agreement.  819 F.2d 400, 407 (3d Cir. 1987), *abrogated on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 287, 108 S. Ct. 1133, 1142 (1988).

Several district court decisions appear, at first glance, to support RBC's contention as well.  For example, in *Sher v. Goldman Sachs*, the subsequent agreement was silent on arbitration and expressly stated that it superseded the prior agreement, which contained a broad arbitration clause.  No. CCB-11-2796, 2012 WL 1377066, at *1–2 (D. Md. Apr. 19, 2012).  The court held that "a subsequent agreement without reference to arbitration does not overcome the presumption of arbitration created by a broad arbitration provision in an initial agreement."  *Id.* at *3.  Likewise, in *DeMartini v. Johns*, the court held that "[a]bsent the explicit intention to rescind an arbitration clause . . . the clause will survive even where the prior agreement itself is rescinded by the latter agreement."  No. 3:12-cv-03929-JCS, 2012 WL 4808448, at *6 (N.D. Cal. Oct. 9, 2012) (alterations in original) (internal quotation marks omitted).

Despite this language, which certainly appears to support RBC's contention, closer examination reveals a critical distinction: in each case cited by RBC, the prior agreement remained effective to some extent for various reasons, whereas here, the prior agreement is *entirely* superseded.  Consequently, whether or not the

16

opinions cited by RBC explicitly recognized the point, those cases essentially involved attempted waivers of the earlier agreement's arbitration provision, notwithstanding superseding language.

*Patten Securities* is the most readily distinguishable of the cases cited by RBC. In that case, nothing suggested that the subsequent agreement was meant to supersede the prior agreement. Instead, one party attempted to argue that a non-exclusive forum selection clause in a subsequent underwriting agreement implicitly superseded a prior agreement's arbitration provision. 819 F.2d at 405. The court analyzed the forum selection clause as a potential waiver, *id.* at 406–07 (discussing "whether a forum selection clause is a *waiver*" (emphasis added)), and accordingly applied the FAA's presumption to its analysis, *id.* at 407 (citing *Cone*, 460 U.S. at 24–25, 103 S. Ct. at 941). Because the forum selection clause was not inconsistent with arbitration, the court held that the arbitration provision was not "waive[d]." *Id.*

In *Bank Julius Baer* and *DeMartini*, the prior agreements were explicitly incorporated by reference into the new agreements, meaning that the prior agreements were not actually superseded. *See Bank Julius Baer*, 424 F.3d at 283 (noting that the subsequent agreement stated: "all the rights and remedies . . . are *cumulative* and not exclusive of any rights or remedies provided under *any other agreement*" (internal quotation marks omitted)); *DeMartini*, 2012 WL 4808448, at

17

*2 (noting that the subsequent agreement stated: "[a]ll other terms and conditions of the original . . . Agreement . . . shall remain in full force and effect." (alteration in original) (internal quotation marks omitted)).

Similarly, in *Sher*, the subsequent agreement's application was explicitly limited to "matters covered by" that agreement. *See* 2012 WL 1377066 at *1.  In essence, it functioned as an amendment to portions of the prior agreement rather than a superseding wholesale replacement of that agreement.  *Sher* also cited with approval the Second Circuit's recognition that in circumstances where "invalidating the first agreement 'would . . . lead to absurd results,'" courts should not invalidate the first agreement.  *Id.* at *3 (quoting *Bank Julius Baer*, 424 F.3d at 283).

Contrary to RBC's position, however, these cases do not hold that arbitration clauses in *entirely superseded* agreements remain effective unless specifically eliminated.  Indeed, these cases could not support such a rule because none of them dealt with an entirely superseded agreement.  When an agreement containing an arbitration provision is entirely superseded, as happened here, the existence of a "validly formed and enforceable arbitration agreement" is called into question.  *Granite Rock*, 561 U.S. at __, 130 S. Ct. at 2858.  And as noted above, when making determinations related to formation, state law applies without the FAA's presumption.  *See id.*; *First Options*, 514 U.S. at 943–44, 115 S. Ct. at 1924

18

(recognizing that "arbitration is simply a matter of contract" and that "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts" in these cases).  Thus, the cases cited by RBC are inapplicable because the RBC Agreement was entirely superseded and the FAA's presumption does not apply.  *Cf. Burgess*, 588 S.E.2d at 578.

Both of our sister circuits to address the issue have held that when an entirely superseding agreement is silent on arbitration, arbitration cannot be compelled even if a prior agreement contained an arbitration clause.  *See Applied Energetics*, 645 F.3d at 524–25; *Dottore v. Huntington Nat'l Bank*, No. 1:09-cv-2636, 2010 WL 3861010, at *4 (N.D. Ohio Sept. 28, 2010), *aff'd* 480 F. App'x 351 (6th Cir. 2012); *see also Burgess*, 588 S.E.2d at 578.[7]  In *Applied Energetics*, as in the cases cited by RBC, the subsequent agreement was silent on arbitration and contained a merger clause, implying that it would replace a prior agreement containing an arbitration clause.  645 F.3d at 523–24.  Unlike the cases cited by RBC, however, in *Applied Energetics*, nothing contradicted the subsequent agreement's merger clause: the prior agreement was not incorporated by reference; the subsequent agreement did not purport to be a mere amendment to the prior agreement; and the prior agreement's terms were not necessary to avoid absurd

---

[7] To avoid any confusion that may result from citing both federal and state case law to support this point, we specifically note that the question of whether state or federal law applies is itself a question of federal law.  Thus, we cite *Applied Energetics* and *Dottore* for the proposition that state law applies, unburdened by the FAA's presumption.  We cite *Burgess* to show the outcome when we apply state law in this case.

19

results.  Under these circumstances, the Second Circuit held that the district court erred by relying on *Bank Julius Baer* to compel arbitration.  *Id.* at 524.  Instead, the court relied on the basic legal principle that "contracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration."  *Id.* at 525.

RBC attempts to salvage its "silence is per se insufficient" argument by suggesting that the subsequent agreement in *Applied Energetics* did, in effect, specifically supersede the arbitration provision.  In other words, the critical factor in RBC's view was not the fact that the prior agreement was entirely superseded, but rather the fact that the subsequent agreement contained an exclusive forum selection clause that specifically precluded arbitration.  This provision stated that the parties *shall* resolve their disputes in state court.  *Id.* at 525–26.  The court found that this language plainly precluded arbitration because if a dispute *shall* be resolved in state court, it cannot be resolved through arbitration.  *Id.*  RBC contends that when the Second Circuit held that the "subsequent agreement . . . plainly preclude[d] arbitration," *id.* at 525, it was referring to the exclusive forum selection clause which specifically precluded arbitration.  There is no such clause in the PNC Agreement, and therefore RBC asks us to distinguish *Applied Energetics*.

RBC misunderstands the basis for the Second Circuit's holding in *Applied Energetics*.  To be sure, the Second Circuit noted that the forum selection clause precluded arbitration, *id.*, but the Second Circuit made clear that this was not the primary basis for its holding: "Even assuming, . . . that the [arbitration clause and the forum selection clause] could reasonably be read as complementary, we conclude that the district court erred in applying the presumption in favor of arbitration."  *Id.* at 526.  Unlike *Bank Julius Baer*, which involved a mere waiver of the prior agreement containing an arbitration provision, *Applied Energetics* involved an entirely superseding subsequent agreement.  *Id.* ("[T]he Placement Agreement [that is silent on arbitration] superseded the Engagement Agreement [containing an arbitration provision].").  Therefore the FAA's presumption did not apply because "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."  *Id.*

It is critical that neither *Bank Julius Baer* nor *Applied Energetics* relied on the FAA's presumption to determine the threshold question of whether the prior agreement was entirely superseded.  In *Bank Julius Baer*, the court applied the FAA's presumption only after determining that the superseding language in the merger clause would not be given full effect.  424 F.3d at 283–85.  In *Applied*

*Energetics*, the court analyzed whether the prior agreement was entirely superseded under state law.  645 F.3d at 526.

Because this case is like *Applied Energetics* and not like *Bank Julius Baer* in that the RBC Agreement was entirely superseded, the FAA's presumption simply does not apply.  RBC's contention that silence is insufficient to invalidate a prior agreement's arbitration provision may well be correct when the FAA's presumption applies, but in cases like this where that presumption does not apply, arbitration clauses must be treated like any other portion of a party's agreement.  And when "all prior agreements" are superseded, as they were here, a prior arbitration agreement is superseded because it obviously fits within the category of "all prior agreements."

This is precisely the conclusion reached by the Sixth Circuit in *Dottore* under facts that are nearly identical to those in this case.  *See* 2010 WL 3861010, at *1–2.  There, a bank and its customer replaced their original account agreement that contained an arbitration clause with a completely new agreement that did not mention arbitration but was "in every respect a fully self-contained document."  *Id.* at *2, *4.  The district court denied the bank's motion to compel arbitration, and the Sixth Circuit affirmed, even though the subsequent agreement neither mentioned arbitration nor contained an exclusive forum selection clause.  *See Dottore*, 480 F. App'x at 353.  The fact that the new account agreement did "not

22

include any arbitration provision, and [did] not refer to any previously existing agreement[]" was sufficient to render the prior agreement's arbitration provision ineffective. *Dottore*, 2010 WL 3861010, at \*4.

We agree with the Second and Sixth Circuits, and hereby hold that an entirely superseding agreement renders a prior agreement's arbitration clause ineffective, even if the superseding agreement is silent on arbitration. The threshold determination of whether a subsequent agreement entirely superseded a prior agreement is made under state law, without applying the FAA's presumption. If the subsequent agreement only partially supersedes the prior agreement, amends it, or waives some but not all of its provisions, the second question is whether the arbitration provision was among the superseded, amended, or waived provisions.[8] If, however, the subsequent agreement entirely superseded the prior agreement, then the second question is whether the subsequent agreement *alone* supports a motion to compel arbitration, and this determination is also made under state law without applying the FAA's presumption. Applying that test here, as already

[8] In *Bank Julius Baer*, the court applied the FAA's presumption when answering this question, but our efforts to distinguish *Bank Julius Baer* should not be taken as an implicit endorsement of that decision. Here, the facts are analogous to those in *Applied Energetics*, and we are persuaded by the reasoning used in that case. *Applied Energetics* clearly and accurately articulated the Supreme Court's precedent, which holds that while doubts concerning the "scope of arbitrable issues should be resolved in favor of arbitration," *Cone*, 460 U.S. at 24–25, 103 S. Ct. at 941, the FAA's presumption applies only after the court is "persuaded that the parties' arbitration agreement was validly formed," *Granite Rock*, 561 U.S. at __, 130 S. Ct. at 2858. In other words, the FAA's presumption applies to questions of scope but not to questions of formation. We adopt this rule without discussing whether or not it was properly applied in *Bank Julius Baer* and other cases cited by RBC that invoked the FAA's presumption to decide whether an arbitration clause had been waived by a subsequent agreement.

23

discussed, the RBC Agreement was entirely superseded, and the PNC Agreement does not support a motion to compel arbitration on its own.

## C.

RBC contends, in the alternative, that the district court must be reversed because arbitration can be required pursuant to the RBC Agreement's termination clause. That clause states:

> Transactions initiated prior to the effective date of termination of the Agreement will not be affected by the termination. Transactions initiated prior to termination will continue to be subject to the terms and conditions of the Agreement.

RBC claims that the RBC Agreement was effectively terminated when PNC issued the PNC Agreement, and therefore the RBC Agreement's terms still apply to the dispute in question, which arose prior to this termination. Further, courts have consistently held that arbitration provisions survive the termination of the agreements containing those provisions. *See, e.g.*, *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 255, 97 S. Ct. 1067, 1074 (1977). The district court disagreed, holding that the RBC Agreement was superseded rather than terminated, but RBC insists this is a distinction without a difference.

RBC is incorrect. In cases like *Nolde Brothers*, the parties terminated their contractual relationship, leaving the reviewing court with two options: look to the now-terminated agreement, or resolve the dispute without resort to any agreement

24

at all.  The Court opted for the former, applying the FAA's presumption and reasoning that "there is little reason to construe this contract to mean that the parties intended their contractual duty to submit grievances [to arbitration] to terminate [with the contract]; the alternative remedy of a lawsuit is the very remedy the arbitration clause was designed to avoid."  *Id.* at 254, 97 S. Ct. at 1073.  Here, the court was faced with an entirely different choice: presume the now-superseded RBC Agreement's terms control, or look to the newly-agreed-to PNC Agreement.  RBC asks us to choose the former based on the termination clause and the Court's reasoning in *Nolde Brothers*, but to do so in this case would be to *ignore* the terms of the RBC Agreement rather than merely making a presumption based on contractual silence.  *Nolde Brothers* is therefore inapplicable.

Stated differently, the RBC Agreement contemplated two distinct scenarios: one—covered by the termination clause—would occur if the parties ended their contractual relationship, while the other—covered by the amendment clause—would occur if the parties agreed to continue their relationship under terms of a new agreement.  When PNC acquired RBC, PNC acquired all of RBC's rights including its right to choose the second scenario, which PNC did by issuing the new PNC Agreement.  The result of that choice—replacing the RBC Agreement's terms with those in the PNC Agreement—is clearly stated in the RBC Agreement and is not contradicted in the PNC Agreement.  Thus, to rely on the termination

clause to look back to the RBC Agreement, we would have to ignore the clause giving PNC the right to replace the RBC Agreement. The district court properly refused to do so and instead recognized that there was a meaningful distinction between terminating the agreement on the one hand and superseding it on the other, if for no other reason than that the parties agreed to treat the two situations differently. In contract cases, no other reason is necessary.

D.

Even if we hold that the RBC Agreement's arbitration clause is superseded, RBC claims that because the facts giving rise to this dispute occurred while the RBC Agreement was still effective, the dispute is subject to arbitration. In other words, RBC claims that the terms of the PNC Agreement apply only prospectively to govern the parties' relationship moving forward, not retroactively to govern interactions between the parties in the past.

In support of its claim, RBC accurately points out that where terms have been applied retroactively, contractual language explicitly authorized that result. *See, e.g.*, *Daniel v. Chase Bank USA, N.A.*, 650 F. Supp. 2d 1275, 1288 (N.D. Ga. 2009) (noting that although the original agreement did not require arbitration, the contract stated that terms could be amended at any time and that amended terms would apply to new transactions *and* "to all outstanding" debt). RBC claims that here, by contrast, nothing in the PNC Agreement authorizes retroactive application,

26

and its case becomes even stronger in light of clearly prospective language in the RBC Agreement. The RBC Agreement states, "[w]e will normally set an effective date for each change, but if we do not do so, the effective date will be the date we make the change." Thus, because the PNC Agreement did not become effective until after litigation in this dispute began and well after the alleged breaches occurred, RBC concludes that the RBC Agreement's arbitration clause is applicable to resolve this dispute.

RBC also correctly points out that *Dottore* and *Applied Energetics* are distinguishable because in those cases, the alleged breaches occurred after the new agreements became effective, and thus after the arbitration clauses were superseded. Here, by contrast, the arbitration clause was not superseded until after the facts giving rise to this dispute occurred. RBC claims that this distinction requires us to reach a different holding here.

RBC's argument fails because, contrary to its assertion, the parties agreed to apply the terms of the PNC Agreement retroactively. The amendment clause in the RBC Agreement states that "the most current version of the Agreement supersedes all prior versions and will *at all times govern*." (Emphasis added.) "At all times" necessarily includes the past, present, and future, and therefore, according to the terms of the RBC Agreement, the superseding PNC Agreement governs this dispute even though the facts giving rise to it occurred in the past.

27

RBC correctly notes that the PNC Agreement became effective prospectively, but this does nothing to counter Dasher's interpretation of the contract. RBC's misunderstanding is due to a mistaken conflation of two distinct terms in the parties' agreements: an effective date and a governing period. In context, it is clear that an effective date is the date on which an agreement's terms become applicable, while the governing period establishes a time range to which those terms apply once they become effective. In other words, once terms become effective, they apply, but only to matters that occurred during the governing period. When the district court decided this issue, the PNC Agreement's terms were effective and therefore applied, and the facts giving rise to this dispute were within the governing period of "all times" and therefore governed the dispute at hand.[9]

Further, while the alleged breaches in *Dottore* and *Applied Energetics* occurred after the arbitration provisions were superseded, the cases stand for the broader proposition that courts should honor the parties' agreements relating to arbitration. That is precisely what the district court did here. And as RBC noted, if parties agree that terms should be applied retroactively, we honor that choice unless prohibited from doing so. *See Daniel*, 650 F. Supp. 2d at 1288.

---

[9] In contrast to the much broader phrase "at all times governs" that sets the PNC Agreement's governing period, RBC sent a notice to customers in 2008 advising them that "the [RBC] Agreement will *begin to govern*" in 30 days. (Emphasis added.) The fact that RBC had used clearly prospective language—"begin to govern"—makes us even more confident that the phrase "at all times governs" was meant to authorize both prospective and retroactive application of any new agreement's terms.

28

The question remains whether there is a prohibition on retroactively applying the terms of the PNC Agreement as the parties intended. RBC argues that we should answer in the affirmative, to which Dasher responds that RBC is attempting to have it both ways. As Dasher explains, RBC is seeking to compel arbitration to resolve all disputes in this case, even though many of the fees at issue were assessed before an arbitration clause was added to the RBC Agreement for the first time in 2008. To explain this anomaly, which would have us retroactively apply terms adding an arbitration provision while refusing to retroactively apply terms superseding that same provision, RBC points to § 2 of the FAA. That provision states that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid . . . ." 9 U.S.C. § 2. There is, however, no statutory authorization permitting parties to *remove* from arbitration an existing controversy.

RBC's argument again fails. The fact that Congress explicitly required courts to honor retroactively applicable arbitration agreements in no way suggests that courts are prohibited from honoring parties' agreements to retroactively apply terms removing such provisions. After all, "arbitration is simply a matter of contract," *First Options*, 514 U.S. at 943, 115 S. Ct. at 1924. Thus, courts should simply enforce the parties' agreements, whether that means adding a retroactively applicable arbitration provision *or* removing it. Why, then, was § 2 necessary? The answer is that "[t]he FAA was enacted . . . in response to widespread judicial

29

hostility to arbitration agreements." *Concepcion*, __ U.S. at __, 131 S. Ct. at 1745. Section 2 therefore ensured that courts would "place arbitration agreements on an *equal* footing with other contracts," *id.* (emphasis added), and permit parties to add retroactively applicable arbitration clauses, just as it would permit parties to remove them. Thus, the terms of the parties' agreements compelled the district court to apply the PNC Agreement's terms retroactively, and nothing in the FAA prohibits that result.[10]

There is one final reason to conclude that the PNC Agreement's terms should be applied retroactively, and that is North Carolina's policy requiring that contracts be construed against the drafter. *See, e.g.*, *Chavis v. S. Life Ins. Co.*, 347 S.E.2d 425, 427 (N.C. 1986). If RBC had intended to limit the applicability of the PNC Agreement's terms to future disputes, RBC could have used the phrase "begin to govern" as it had before; instead, it used the phrase "at all times govern." While it may seem odd—and to RBC, regrettable—that RBC's successor voluntarily undermined RBC's pending attempt to arbitrate, that is a product of the agreement RBC drafted, which gave its assignee not only the right to compel arbitration but also the power to retroactively eliminate that right. The district

_____

[10] Applying these principles, it appears that RBC is incorrect about which of the two agreements governs retroactively. As discussed *supra* in note 9, when the RBC Agreement and its arbitration clause were issued, RBC stated that they would "begin to govern" in 30 days, apparently precluding retroactive application of the RBC Agreement and its arbitration clause.

30

court properly applied the terms of the parties' agreements as they were written and refused to relieve RBC of the consequences of its own drafting.

E.

Finally, RBC argues that if the RBC Agreement is superseded for purposes of eliminating the arbitration provision, it should also be superseded for purposes of eliminating the provisions Dasher alleges were breached. *See, e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S. Ct. 834, 843 (1995) (holding that states may not "decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause"). Further, RBC insists the district court violated the FAA's command, as interpreted by the Supreme Court in *Concepcion*, not to single out arbitration provisions for disfavored treatment.  __ U.S. at __, 131 S. Ct. at 1746 (prohibiting states from using contract "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue").

RBC's argument again fails for a number of reasons.  First, the district court has not ruled on whether Dasher's claims are still viable; RBC merely predicts that the court will allow those claims to proceed.  RBC's complaint is therefore premature, and even if RBC were correct in the abstract—which it is not—we could not reverse on this basis until the district court actually treated some other provision more favorably than the arbitration provision.

31

Second, and more importantly, RBC confuses two very different situations. RBC claims it had the right to compel arbitration under the RBC Agreement and that the district court denied that right, even though that agreement was not effective when the district court ruled.  Dasher, by contrast, claims that he had the right not to be charged excessive overdraft fees under the RBC Agreement and that RBC violated that right *at a time when that agreement was still effective*.  In other words, when RBC's right to compel arbitration was denied by the district court, RBC did not have a right to compel arbitration because the only agreement granting that right was not effective, but when Dasher was charged allegedly excessive fees, he *did* have a right not to be charged those fees because the agreement granting him that right was effective.

Far from applying a "defense[] that appl[ies] only to arbitration," *Concepcion*, __ U.S. at __, 131 S. Ct. at 1746, the district court was applying basic principles of North Carolina contract law—and common sense—that claims for breach accrue when a breach occurs.  *See Miller v. Randolph*, 478 S.E.2d 668, 670 (N.C. Ct. App. 1996).  Thus, Dasher's claim accrued the moment RBC charged allegedly excessive fees.  Finally, we note that if Dasher, like RBC, was asserting that the RBC Agreement's terms protect him today—that is, if he asserted a claim for breaching the RBC Agreement based on an excessive overdraft fee charged today—the district court would be required to dismiss his claims, just as it rejected

32

RBC's claim that it was entitled to arbitration because the agreement granting that right was no longer effective. But this is not what Dasher is asserting, and it is this critical distinction in timing, not hostility towards arbitration, that explains the difference in treatment between the two parties' claims under the RBC Agreement.

III.

For the foregoing reasons, we agree with the district court's conclusion that RBC cannot compel arbitration here. State law applies when courts determine whether a valid arbitration agreement is in effect, and the FAA's presumption does not. Under North Carolina law, the RBC Agreement was entirely superseded, and the arbitration agreement in that agreement therefore became ineffective. Based on this conclusion, the district court properly looked to the PNC Agreement to determine whether the parties agreed to arbitrate their disputes. Under North Carolina law, the PNC Agreement's silence is insufficient to form such an agreement. Further, based on the terms of the agreements, the PNC Agreement applies retroactively. Because the agreement governing the dispute at hand does not permit RBC to compel arbitration, the district court properly denied RBC's motion.

**AFFIRMED.**